CLIFFORD F. MARTIN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CHARLES W. POWER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Z. MARSHALL CRANE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

STANLEY P. BENTON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 53837–53840.   Promulgated July 26, 1933.

*G. A. O'Donohue, Esq.*, for the petitioners.
*John H. Pigg, Esq.*, for the respondent.

#### OPINION.

GOODRICH: In these proceedings, which were consolidated for hearing, the following deficiencies in income tax for 1928 are in controversy:

| Docket No. | Amount |
| --- | --- |
| 53837 | $1,058.25 |
| 53838 | 5,354.54 |
| 53839 | [1] 7,097.57 |
| 53840 | 3,300.65 |

There is but one issue, namely, whether each of petitioners may deduct from his income his pro rata share of a loss sustained by a

---

[1] Also $2,181.26 for 1927 not in controversy.

syndicate of which he was a member, upon the sale of stock of the Standard Publishing Co. The determination of that issue depends upon whether the loss was " incurred in any transaction entered into for profit, though not connected with the trade or business " and therefore allowable as a deduction under the provisions of section 23 (e), Revenue Act of 1928. The facts were submitted upon stipulation of counsel, supplemented by the testimony of one witness, petitioner Martin. As there is no dispute as to what occurred, and the events are clearly disclosed by the record, we recite herein only those facts essential to an understanding of the issue.

Except Crane, who is a resident of nearby Dalton, petitioners are residents of Pittsfield, Massachusetts. At the times here material all were directors of the Pittsfield National Bank, and of its subsidiary, the Securities Corporation, and also served as officers of one concern or the other. In 1926 the corporation sold a considerable quantity of the stock of the Standard Publishing Co. at prices ranging from $16 to $20 a share, to persons in and about Pittsfield, many of whom were customers of the bank. Within a short time thereafter the stock declined sharply, being sold before the close of the year at $3.50 a share, and it appeared that the purchasers had incurred, or would incur substantial losses from their investments therein. The corporation, the bank, and the officers thereof as individuals were openly censured for having sold the stock to the public. Petitioners feared that this public criticism would react to the detriment of the institutions and themselves and, moreover, felt morally bound to protect the purchasers. Accordingly in July 1927, they formed a syndicate, making petitioner Crane, who was a market operator of considerable experience, the manager, for the purpose of trading on the market to obtain profits with which to repurchase the Standard stock from those who had bought it from the corporation. They informed the corporation, and it informed its customers, that they stood ready to take over the stock on December 15, 1927, at the prices the customers had paid therefor, and, further, to reimburse those customers who had already disposed of their Standard holdings for the losses sustained thereon. Under the syndicate agreement, any profits in excess of the amount necessary to cover the Standard stock purchases and reimbursements were to be divided pro rata among the syndicate members, each of whom contributed to the syndicate funds in agreed proportions, and assumed agreed liabilities against losses which might result from its operations. However, under their notice to the corporation, petitioners agreed to indemnify the Standard stock purchases regardless of the results of the syndicate operations; if trading profits were realized they were to be applied to that end; but if profits were not obtained,

or were insufficient, petitioners were to contribute from their personal funds.

An investigation of the affairs of the Standard Co. revealed a possibility that it might eventually be saved through reorganization, which was effected shortly thereafter. While petitioners did not expect to effect the reimbursement of the Pittsfield purchasers through market recovery of Standard stock, they believed that the amount required to that end would be less than it proved to be and, regarding as one plan and purpose the two operations of the syndicate, that is, its trading operations on the market and the indemnifying of the Standard purchasers, they sought and anticipated a profit from the syndicate transaction.

The syndicate was successful in its trading, and realized therefrom a profit of $116,492.54. About December 15, 1927, when the market value of the Standard stock was $4.12 a share, it bought the Standard stock from the corporation's customers or made good the losses of those who had already sold their holdings. It expended $96,450.26 of its profits in thus covering the corporation's customers. Thereafter, in February 1928, it exchanged the Standard stock thus acquired, together with an undisclosed amount it had purchased on the market " to round out a block," for stock in the reorganized company, and, in May 1928, sold its holdings for $12,776.14. The difference between the cost of the Standard stock and the amount received therefor, or $83,818.42, is claimed by petitioners (in their pro rata shares) as a loss in reduction of the profits realized from the syndicate's trading operations.

Respondent has allowed a loss of $8,631.89, being the difference between the market value of the stock ($4.12 a share) when purchased by the syndicate from the corporation's customers, and the amount received by the syndicate upon its sale. But, although he has not moved for increased deficiencies, he now contends upon brief that no part of the loss is deductible for the reason that it was not incurred in a transaction entered into for profit. The operations of the syndicate he regards as falling in two categories; first, its trading operations on the market, and, second, its purchases and sales of Standard stock. The transactions in the latter class he maintains were not entered into for profit, since it was apparent from the beginning that no profit could be hoped for, and therefore petitioners were discharging a moral, not a legal obligation.

It is well settled that losses incurred solely in discharge of a moral obligation, even though that is necessary to the preservation of one's business reputation, as has been argued, are not allowable as deductions from income under the specific provisions of the statute. *B. Estes Vaughan*, 15 B.T.A. 596, and 17 B.T.A. 620; *Edward Hines*,

18 B.T.A. 21; affd., 58 Fed. (2d) 29; *Willard W. White*, 21 B.T.A. 1087; affd., 61 Fed. (2d) 726; *Phillips Lee Goldsborough*, 18 B.T.A. 181; affd., 46 Fed. (2d) 432; *William G. Park, Executor*, 22 B.T.A. 1263; affd., 58 Fed. (2d) 965; certiorari denied, 287 U.S. 645. It follows that if respondent is correct in treating separately the two principal activities of the syndicate, the loss sustained from its transactions in Standard stock may not be deducted from the income of the members and his determinations must be sustained.

In our opinion his view is correct. A syndicate, or any other body, may consummate any number of transactions, all perhaps related to its business or purpose, but not all having the same status under the statutory provisions defining items deductible from income. Of this syndicate agreement some provisions mutually bound petitioners to contribute certain portions of such amounts as might be necessary to indemnify the customers of their institution for losses sustained; others set up an arrangement whereby petitioners might obtain funds for that purpose. Upon the record before us it is clear that there was no expectation nor hope of deriving a profit from the purchase and resale of Standard stock by the syndicate, and petitioners recognized that the funds necessary to indemnify the corporation's customers would have to be produced from their own then resources, unless the syndicate's market operations should supply them. Had they made such contributions from their own resources, as they were mutually bound to do, whatever their success in trading, the amounts thereof would not have been deductible under the rules laid by the decided cases. We fail to see wherein the situation is changed because they were enterprising and fortunate enough to acquire additional income more than sufficient to permit them to carry out their purpose—the discharge of their moral obligations.

*Judgment will be entered for the respondent.*